Page 1

1

2  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
3  ------------------------------------------X
   ANGELO LOPES,
4
                              PLAINTIFF,
5
        -against-        Case No.:
6                        20-CV-00314
7  JLM DECORATING NYC, INC., COSMOPOLITAN
   INTERIOR NY CORPORATION, JLM DECORATING,
8  INC., CITY VIEW BLINDS OF N.Y., INC.,
   MOSHE GOLD, JOEL GOLD a/k/a SAM GOLD
9  a/k/a SHIMMY GOLD, and MARITZA RODRIGUEZ
   a/k/a MARITZA SIME,
10
                              DEFENDANTS.
11 ------------------------------------------X
12
13                    DATE:  February 11, 2021
14                    TIME:  3:33 P.M.
15
16
17        DEPOSITION of the Defendant, SAM
18 GOLD, taken by the Plaintiff, pursuant to a
19 Notice and to the Federal Rules of Civil
20 Procedure, held on the above date and time,
21 via Virtual Zoom, before Kelli Passalacqua,
22 a Notary Public of the State of New York.
23
24
25

Page 2

```
1
2  A P P E A R A N C E S :
3
4  THE LAW OFFICE OF JON A. STOCKMAN
       Attorneys for the Plaintiff
5     ANGELO LOPES
       32 Broadway, Suite 1710
6     New York, New York  10004
       BY:  JON A. STOCKMAN, ESQ.
7
8
9  MILMAN LABUDA LAW GROUP, PLLC
       Attorneys for the Defendants
10    JLM DECORATING NYC, INC., COSMOPOLITAN
       INTERIOR NY CORPORATION, JLM DECORATING,
11    INC., CITY VIEW BLINDS OF N.Y., INC.,
       MOSHE GOLD, JOEL GOLD a/k/a SAM GOLD
12    a/k/a SHIMMY GOLD, and MARITZA RODRIGUEZ
       a/k/a MARITZA SIME
13    3000 Marcus Avenue, Suite 3W8
       Lake Success, New York  11042
14    BY:  BRETT JOSEPH, ESQ.
15
16
17 ALSO PRESENT:
18    ANGELO LOPES
19
20
21
22
23      *     *     *
24
25
```

Page 3

```
1
2  F E D E R A L  S T I P U L A T I O N S
3
4
5     IT IS HEREBY STIPULATED AND AGREED by and
6  between the counsel for the respective
7  parties herein that the sealing, filing and
8  certification of the within deposition be
9  waived; that the original of the deposition
10 may be signed and sworn to by the witness
11 before anyone authorized to administer an
12 oath, with the same effect as if signed
13 before a Judge of the Court; that an
14 unsigned copy of the deposition may be used
15 with the same force and effect as if signed
16 by the witness, 30 days after service of
17 the original & 1 copy of same upon counsel
18 for the witness.
19
20    IT IS FURTHER STIPULATED AND AGREED that
21 all objections except as to form, are
22 reserved to the time of trial.
23
24      *   *   *   *
25
```

Page 4

```
1              S. GOLD
2  S A M   G O L D, called as a witness,
3  having been first duly sworn by a Notary
4  Public of the State of New York, was
5  examined and testified as follows:
6  EXAMINATION BY
7  MR. STOCKMAN:
8     Q.   Please state your name for the
9  record.
10    A.   Sam Gold.
11    Q.   What is your address?
12    A.   13 Eastview Road, Monsey, New
13 York 10952.
14    Q.   Mr. Gold, my name is Jon
15 Stockman.  I am the attorney for Angelo
16 Lopes in his federal lawsuit against JLM
17 Decorating, as well as other named
18 Defendants.
19       Have you ever been deposed
20 before?
21    A.   Yes.
22    Q.   When were you deposed?
23    A.   Roughly two years ago.
24    Q.   What was the nature of the
25 lawsuit or action in which you were
```

Page 5

```
1              S. GOLD
2  deposed?
3       MR. JOSEPH:  Objection.
4       You can answer.
5     A.   A dispute of construction.  If
6  he did the work or didn't do the work.
7     Q.   Do you know the name of the
8  party that was suing?
9     A.   I don't recall.
10    Q.   Were you a party to that
11 action?
12    A.   Explain the question, please.
13    Q.   The lawsuit in which you were
14 deposed, were you a named Defendant in that
15 lawsuit?
16    A.   No.
17    Q.   Are you familiar with Angelo
18 Lopes?
19    A.   Yes.
20    Q.   How are you familiar with him?
21    A.   I used to work with him.
22    Q.   You used to work with him at
23 JLM?
24    A.   Correct.
25    Q.   Do you remember when you worked
```

2 (Pages 2 - 5)

Page 6

```
1              S. GOLD
2  for Angelo Lopes?
3      A.   In 2019.
4      Q.   Did you work with him in 2018
5  as well?
6      A.   Yes.
7      Q.   What was your position with JLM
8  in 2018?
9      A.   Operations.
10     Q.   What is your job title with JLM
11 in 2019?
12     A.   Same.
13     Q.   Are you still operations with
14 JLM?
15     A.   Yes.
16     Q.   What were your responsibilities
17 as operations?
18     A.   Manage the jobs.
19     Q.   What types of jobs are these?
20     A.   Painting.
21     Q.   What does manage the jobs
22 consist of?
23     A.   To keep it in control, to keep
24 the job running, whatever it requires.
25     Q.   As operations, did you
```

Page 7

```
1              S. GOLD
2  physically visit the job sites?
3      A.   Not on a daily, but when it
4  requires.
5      Q.   Is there a supervisor from JLM
6  at these job sites?
7      A.   Yes.
8      Q.   What do the JLM supervisors do?
9          MR. JOSEPH:  Objection.
10         You can answer.
11     A.   Run the job on the daily in the
12 field.
13     Q.   As operations, did you have any
14 interaction with the painters themselves?
15     A.   When needed.
16     Q.   Do you know the names of any of
17 the painters that work for JLM?
18         MR. JOSEPH:  Objection.
19         You can answer.
20     A.   Not really.
21     Q.   Who would know the names of the
22 painters that work for JLM?
23         MR. JOSEPH:  Objection.
24         You can answer.
25     A.   The guys on the field.
```

Page 8

```
1              S. GOLD
2      Q.   Who are some of the guys on the
3  field?
4      A.   The supervisors.
5      Q.   Who are some of the
6  supervisors?
7      A.   Explain the question.
8      Q.   Who are some of the supervisors
9  with JLM?
10     A.   Who they are you mean with
11 what?
12     Q.   What are their names?
13         MR. JOSEPH:  Objection.
14         You can answer if you can.
15     A.   I don't know by heart all the
16 names.
17     Q.   Do you remember the names of
18 any of the supervisors that work for JLM?
19     A.   Yes.
20     Q.   What names do you remember?
21     A.   Roy Katzman.
22     Q.   Do you remember anyone else
23 besides Roy Katzman?
24     A.   Jose Arias.
25     Q.   Anyone else?
```

Page 9

```
1              S. GOLD
2      A.   Diego Perez.
3      Q.   Anyone else?
4      A.   Not at the moment.
5      Q.   Are you involved with payroll?
6      A.   Depends on what extent.
7      Q.   What extent are you involved in
8  payroll?
9      A.   I approve time of all the guys.
10     Q.   When you say "guys," do you
11 mean the painters?
12     A.   Correct.
13     Q.   How do you make the
14 determination as to whether to approve a
15 painter's time?
16     A.   We have the payroll company and
17 they clock in every day and they clock out.
18     Q.   How do the painters clock in?
19     A.   On a time sheet.
20     Q.   Is it just a time sheet or is
21 there a clock?
22     A.   It is a time sheet.
23     Q.   How does JLM determine when a
24 painter began working on a particular day?
25         MR. JOSEPH:  Objection.
```

3 (Pages 6 - 9)

S. GOLD

1
2        You can answer.
3     A.   On a time sheet, they work.
4     Q.   Does the painter write down
5 when he started working?
6        MR. JOSEPH:  Objection.
7        You can answer.
8     A.   Yes.
9     Q.   Does anyone at the job site
10 monitor whether a painter is truthfully
11 recording their start time?
12       MR. JOSEPH:  Objection.
13       You can answer.
14    A.   They go to their supervisor to
15 clock in and fill out their time sheet.
16    Q.   Does the supervisor write in
17 the time?
18    A.   They write themselves in front
19 of the supervisor.
20    Q.   To your knowledge, are the JLM
21 painters employees or independent
22 contractors?
23       MR. JOSEPH:  Objection.
24       You can answer.
25    A.   Employees.

S. GOLD

1
2     Q.   To your knowledge, has JLM used
3 independent contractors to perform painting
4 work on behalf of JLM?
5        MR. JOSEPH:  Objection.
6        You can answer.
7     A.   I don't recall.
8     Q.   Do you know who signs the
9 payroll checks at JLM?
10    A.   Moshe Gold.
11    Q.   Was there a point where a JLM
12 painter was paid in cash, to your
13 knowledge?
14    A.   No.
15    Q.   What type of tools are used at
16 a job site?
17    A.   I don't know.  I'm not a
18 mechanic.
19    Q.   What do the painters use at a
20 job site?
21    A.   I'm not a mechanic.  They use
22 whatever they need to use.
23    Q.   Who determines what the
24 painters are to use?
25    A.   I'm not dealing with the

S. GOLD

1
2 painters what to use.
3     Q.   Are the supervisors telling the
4 painters what to use?
5     A.   I guess so.
6     Q.   Do you know why Angelo Lopes is
7 no longer employed with JLM?
8     A.   Yes.
9     Q.   Why is Angelo no longer
10 employed by JLM?
11    A.   He didn't deliver quality work.
12    Q.   Can you give me specifics about
13 how Angelo Lopes failed to deliver quality
14 work?
15    A.   He didn't document his work.
16 He didn't share with the team his work.
17    Q.   Were you involved in Angelo
18 Lopes' termination?
19       MR. JOSEPH:  Objection.
20       You can answer.
21    A.   No.
22    Q.   Did you recommend that Angelo
23 Lopes be terminated?
24    A.   When I got asked specifics what
25 he is doing, I understand the specifics.

S. GOLD

1
2     Q.   Who asked you what Angelo was
3 doing?
4     A.   Moshe Gold.
5     Q.   Do you remember some of the
6 questions that Moshe asked you about
7 Angelo?
8     A.   Yes.
9     Q.   What are some of the questions
10 that Moshe asked you about Angelo?
11    A.   How the jobs are being managed.
12    Q.   When Moshe asked how the jobs
13 were being managed, what was your response?
14    A.   Not good.
15    Q.   Did you further elaborate?
16       MR. JOSEPH:  Objection.
17       You can answer.
18    A.   Explain the question.
19       MR. STOCKMAN: Can we read back
20    my question and his answer.
21       (Whereupon, the referred to
22    question and answer were read back by
23    the Reporter.)
24    Q.   When Moshe asked you how the
25 jobs were being managed, did you provide

4 (Pages 10 - 13)

Page 14

S. GOLD

1
2 any response other than "not good"?
3     A.   Depends on the situation.
4     Q.   Let's talk about the different
5 situations.
6     A.   Every job the specifics.  I
7 don't recall specifics on any job.
8     Q.   Are you saying you don't
9 remember the specifics with respect to any
10 of the jobs?
11     A.   Correct.
12     Q.   Why did you answer that things
13 were not good?
14     MR. JOSEPH:  Objection.
15     You can answer.
16     A.   Because that was the fact.
17     Q.   What is that based on?
18     A.   On the specifics on the moment
19 of the job.
20     Q.   Is there any documentary
21 evidence that things were not good?
22     MR. JOSEPH:  Objection.
23     You can answer.
24     A.   Yes, there is definitely
25 evidence.

Page 15

S. GOLD

1
2     Q.   What evidence is that?
3     A.   The jobs wasn't documented
4 right, missing a lot of information on
5 almost every job he was on.  Jobs went over
6 and beyond budget.  It wasn't managed
7 proper.
8     Q.   What jobs were over budget?
9     A.   I don't recall the specific job
10 at the moment.
11     Q.   How did you determine that a
12 job was over budget?
13     A.   We have a system where we plug
14 in all information.  Quick Books can tell
15 you everything, every dollar that comes in,
16 every dollar that goes out.
17     Q.   Did you look at any documents,
18 any specific information, to determine that
19 things were not good?
20     A.   Absolutely.
21     Q.   What did you look at?
22     A.   I review every week document.
23 Every day document.
24     Q.   What are those documents?
25     A.   Ultipro, whatever the document

Page 16

S. GOLD

1
2 requires, workforce, production T&L.
3     Q.   I believe you mentioned about
4 how there was missing information; is that
5 accurate?
6     A.   Yes, I mentioned he didn't
7 document any of his work.
8     Q.   How was Angelo supposed to
9 document his work?
10     A.   We have our procedure in the
11 office.
12     Q.   What is that office procedure?
13     A.   It depends on what specific.
14 We have every detail.  It is very detailed
15 how we do stuff.
16     Q.   How do you do stuff?
17     MR. JOSEPH:  Objection.
18     Can you rephrase that question?
19     MR. STOCKMAN:  I will strike
20     that question.
21     Q.   Are these office procedures in
22 writing?
23     A.   Some.
24     Q.   What office procedures are in
25 writing?

Page 17

S. GOLD

1
2     A.   Some procedures, I don't know
3 off the top of my head the details.
4     Q.   When Angelo was working for
5 JLM, were there some of these office
6 procedures in writing?
7     A.   As I mentioned before, yes.
8     Q.   When did you begin working for
9 JLM?
10     A.   I don't know the exact.
11     Q.   Did you attend college?
12     MR. JOSEPH:  Objection.
13     You can answer.
14     A.   Yes.
15     Q.   Do you have a Bachelor's
16 Degree?
17     A.   Yes.
18     Q.   Do you have any Master's Degree
19 or any professional degree?
20     A.   Yes.
21     Q.   What type of Master's or
22 professional degree do you possess?
23     A.   Chaplain.
24     Q.   Where did you attend college?
25     A.   UTS.

5 (Pages 14 - 17)

Page 18

S. GOLD

1
2    Q.   What does UTS stand for?
3    A.   I don't know the exact.
4    Q.   What did you major in in
5  college?
6    A.   Again, please.
7    Q.   What was your major in college?
8    A.   The degree?
9    Q.   Yes.
10   A.   I don't recall.
11   Q.   Did you take any business
12 courses in college?
13   A.   Not in college.
14   Q.   When did you graduate from
15 college?
16   A.   I don't recall the top of my
17 head the exact date.
18   Q.   Do you remember the year?
19   A.   Not the year.
20   Q.   How old are you currently?
21   A.   Twenty-seven.
22   Q.   Did you have a job before you
23 began working for JLM?
24   A.   Yes.
25   Q.   What was that job?

Page 19

S. GOLD

1
2    A.   Closed containment and
3  commercial pharmacy.
4    Q.   What were your job duties in
5  that position?
6    A.   Closed containment.
7    Q.   What is closed containment?
8    A.   Control cost.
9    Q.   You worked at a pharmacy?
10   A.   Yes.
11   Q.   What pharmacy did you work for?
12   A.   Specialty RX.
13   Q.   Prior to working at Specialty
14 RX, did you work anywhere else?
15   A.   No.
16   Q.   Was JLM the first commercial
17 painting company that you worked for?
18   A.   Yes.
19   Q.   What type of qualifications did
20 you have to work in the commercial painting
21 industry?
22        MR. JOSEPH:  Objection.
23        You can answer.
24   A.   Explain your question.
25   Q.   What type of qualifications or

Page 20

S. GOLD

1
2  experience did you have to work in the
3  commercial painting industry?
4    A.   I need specifics. I don't know
5  what to answer overall.
6    Q.   Did you have any knowledge
7  about the commercial painting industry
8  before you began working for JLM?
9    A.   Yes.
10   Q.   How did you acquire that
11 knowledge?
12   A.   Talking from people.
13   Q.   Do you remember which people
14 you spoke to?
15   A.   No.
16   Q.   Did you talk to your father
17 about the commercial painting industry?
18   A.   I don't recall. Probably some.
19   Q.   What do you remember having
20 known about the commercial painting
21 industry prior to begin working for JLM?
22        MR. JOSEPH:  Objection.
23        You can answer.
24   A.   I don't know. I don't recall
25 what happened a few years ago.

Page 21

S. GOLD

1
2    Q.   Do you know if Angelo Lopes
3  quit before he was terminated?
4    A.   Yes.
5    Q.   How do you know that?
6    A.   I saw it. I got told.
7    Q.   What did you see?
8    A.   Him walking out of the office.
9    Q.   How do you know that he quit by
10 just seeing him walk out of the office?
11   A.   Because on the way out he told
12 me.
13   Q.   Do you remember specifically
14 what Angelo told you when he was walking
15 out of the office?
16   A.   Not the exact words, no.
17   Q.   Did anyone else tell you that
18 Angelo quit?
19   A.   It was talk, but no one came
20 over to tell me a story that he quit.
21   Q.   Is it accurate to say that
22 Angelo quit before JLM made the
23 determination to terminate his employment?
24   A.   Yes.
25   Q.   Do you have the authority to

6 (Pages 18 - 21)

S. GOLD

1
2 hire JLM employees?
3    A.   Not office employees.
4    Q.   How about painters?
5    A.   Yes.
6    Q.   Have you ever hired a painter
7 before?
8    A.   Yes.
9    Q.   Have you intervened painters
10 before?
11    A.   If I ever did?
12    Q.   Yes.
13    A.   Yes.
14    Q.   What does the hiring process
15 for JLM painters consist of?
16    A.   JLM has a handbook.  We give
17 everyone a handbook before they come to the
18 job.  They sign the handbook and they need
19 to meet the safety OSHA rules, they need to
20 meet the company rules, and they need to
21 sign the handbook and read it with all the
22 details in it.
23    Q.   What are some of the details in
24 the handbook?
25       MR. JOSEPH:  Objection.

S. GOLD

1
2    A.   I don't know by heart.
3    Q.   Does the handbook contain any
4 information about antidiscrimination laws?
5       MR. JOSEPH:  Objection.
6       You can answer.
7    A.   Yes.
8    Q.   Did JLM give out this handbook
9 to the painters while Angelo Lopes was
10 still employed by JLM?
11    A.   Yes.
12    Q.   At that time, did the handbook
13 have information about the
14 antidiscrimination laws?
15    A.   Yes.
16    Q.   Did you ever read the company
17 handbook?
18    A.   Yes.
19    Q.   Had you read the company
20 handbook while Angelo Lopes was still
21 employed by JLM?
22    A.   Yes.
23    Q.   Is it is accurate to say that
24 you read the company handbook
25 antidiscrimination language while Angelo

S. GOLD

1
2 Lopes was still employed by JLM?
3    A.   I read it, yes.
4    Q.   Do you know if the company
5 handbook has any information about the
6 minimum wage?
7    A.   I don't recall.
8    Q.   Do you know if your father,
9 Moshe Gold, has ever read the company
10 handbook?
11       MR. JOSEPH:  Objection.
12       You can answer.
13    A.   I don't know.
14    Q.   How does a painter apply to
15 work for JLM?
16    A.   There is a lot of ways.
17    Q.   What ways do you know about?
18    A.   A friend of friend.
19    Q.   Are these painters formally
20 interviewed before they begin working for
21 JLM?
22    A.   Some.
23    Q.   Are you paid a salary at JLM?
24    A.   Again the question, please.
25    Q.   Are you paid a salary at JLM?

S. GOLD

1
2       MR. JOSEPH:  Objection.
3       You can answer.
4    A.   Am I being paid you're asking?
5    Q.   Are you being paid a salary at
6 JLM?
7    A.   Yes.
8    Q.   Have you been paid a salary
9 since you have begun working for JLM?
10    A.   Yes, I'm a salary paid
11 employee.
12    Q.   Has your salary ever been
13 reduced while working at JLM?
14    A.   I don't recall.  I have to
15 check my records.
16    Q.   Are you aware of any employee
17 having their salary reduced at JLM?
18    A.   I'm not involved in anyone's
19 pay.
20    Q.   To your knowledge, are JLM and
21 Cosmopolitan Interior the same company?
22       MR. JOSEPH:  Objection.
23       You can answer.
24    A.   It is two different names, two
25 different companies.

7 (Pages 22 - 25)

Case 1:20-cv-00314-BCM   Document 47-4   Filed 04/30/21   Page 8 of 26

S. GOLD

1    S. GOLD
2    Q.   What is the difference?
3        MR. JOSEPH:  Objection.
4        You can answer.
5    A.   I don't know the difference.  I
6  only work for JLM.
7    Q.   Did Angelo Lopes ever complain
8  to you about painters not being given pay
9  stubs?
10    A.   No.
11    Q.   Did Angelo Lopes every complain
12  to you about painters being paid in cash?
13    A.   There is no painter that is
14  being paid in cash.  Not in this company.
15    Q.   So, JLM, to your knowledge, has
16  never paid a painter in cash?
17    A.   No, not under my supervision.
18    Q.   Cosmopolitan has never paid a
19  painter in cash, to your knowledge?
20    A.   I don't know Cosmopolitan.
21    Q.   Has City View Blinds paid a
22  contractor in cash?
23    A.   I have no idea City View
24  Blinds.  I work for JLM and JLM only.
25    Q.   Do you remember if Angelo Lopes

S. GOLD

1    S. GOLD
2  complained to anyone at the company about
3  JLM paying painters in cash?
4    A.   I only know what people tell
5  me.  I answered before, he didn't complain
6  to me.
7    Q.   Did anyone tell you that Angelo
8  made complaints?
9    A.   Not to my knowledge.
10    Q.   Has JLM ever had a system where
11  the painters on the job could hire other
12  workers to work for them?
13    A.   No, every worker is being hired
14  by the office.
15    Q.   Who hires the workers?
16    A.   They are being brought into the
17  office, to the field as I mentioned before
18  from a friend of friend, most of them, and
19  they sign paperwork.
20    Q.   Who determines whether or not
21  they work for JLM?
22    A.   If they work on the job they
23  work for JLM.
24    Q.   Who determines when a
25  particular person coming to the office is

S. GOLD

1    S. GOLD
2  going to work for JLM, who hires the
3  painters?
4    A.   The painter come to the office,
5  they sign paperwork.  When they have
6  paperwork in place, they being called when
7  there is available work on the field.
8    Q.   Who calls them?
9    A.   Every job manager on his job.
10    Q.   Has there ever been a time
11  where a job candidate comes to the office
12  and JLM decides not to use that individual?
13    A.   With a job, you mean a worker?
14    Q.   A worker comes to the office to
15  apply for the job and ultimately not hired
16  for JLM?
17    A.   Absolutely.
18    Q.   What are some of the reasons
19  why a job candidate would not be hired?
20    A.   Because he is not qualified to
21  deliver quality work.
22    Q.   Who made the determination that
23  a particular job candidate is not
24  qualified?
25    A.   The determination is made, it

S. GOLD

1    S. GOLD
2  is through me.
3    Q.   Is there anyone else that has
4  made that determination before?
5    A.   Or I'm being told from people
6  on the field that this guy is not a quality
7  worker.
8    Q.   To be clear, you've terminated
9  JLM employees before?
10        MR. JOSEPH:  Objection.
11        You can answer.
12    A.   Only painters.
13    Q.   I'd like to turn your attention
14  to the document that has been marked or
15  should be marked Plaintiff's Exhibit B.
16        MR. JOSEPH:  That is the May
17      28, 2019 letter?
18        MR. STOCKMAN:  Yes.
19        MR. JOSEPH:  Sam, do you have
20      that in front of you?
21        THE WITNESS:  Yes.
22    Q.   Mr. Gold, I'd like you to
23  review the May 28, 2019 letter and tell me
24  when you're done reviewing the letter.
25    A.   I'm done.

8 (Pages 26 - 29)

Page 30

S. GOLD

1
2    Q.   Do you recognize the May 28,
3  2019 letter?
4    A.   I read it before this meeting,
5  so yes.
6    Q.   When did you first read this
7  letter?
8    A.   I don't recall the exact date.
9    Q.   Did you read this letter before
10  it was given to Angelo?
11    A.   I don't recall.
12    Q.   Did you help write this letter?
13    A.   Nope.
14    Q.   Do you know who helped write
15  the letter?
16       MR. JOSEPH:  Objection.
17       You can answer.
18    A.   No.
19    Q.   There is an allegation in the
20  letter that Mr. Lopes was not following
21  office procedures regarding proposals, is
22  that allegation accurate?
23    A.   Yes.
24    Q.   Do you remember any specific
25  example of Mr. Lopes not following office

Page 31

S. GOLD

1
2  procedures regarding proposals?
3    A.   Yes.
4    Q.   Tell me about the specific
5  examples.
6    A.   Proposals is basically extra
7  work beyond the contract that we have in
8  place.  He gave the direction to the guys
9  to the field to go ahead when he never even
10  sent out the letter and definitely get it
11  approved so the company lost money every
12  time that happened.
13    Q.   Explain to me how the company
14  lost money.
15    A.   Because guys are working on the
16  field and the company cannot collect money
17  for the work.  The company is losing
18  because the company is paying payroll and
19  material.
20    Q.   So, are you saying Angelo sent
21  out proposals that hadn't been approved by
22  customers?
23    A.   He gave the okay for the field
24  to produce work without being sent the
25  proposal or without being approved by the

Page 32

S. GOLD

1
2  customer.
3    Q.   Can you give me an example of
4  when they happened?
5    A.   I just gave you an example.
6    Q.   Give me an example of a
7  customer who did not pay for work because
8  the proposal had not been approved.
9    A.   I don't know customers' names
10  and specifics like that on the top of my
11  head.
12    Q.   There is an allegation in the
13  May 28, 2019 letter that Angelo was not
14  managing assigned projects including, but
15  not limited to, field operations, project
16  schedule, etc, is that allegation accurate?
17    A.   Yes.
18    Q.   What projects did Angelo fail
19  to manage?
20    A.   Almost every one.
21    Q.   Give me examples.
22    A.   Again, I don't know the project
23  name from that time on top of my head.
24    Q.   What does it mean he was not
25  managing assigned projects, what does that

Page 33

S. GOLD

1
2  mean to you?
3    A.   He didn't visit job.  He didn't
4  do anything about the job.  So, the job was
5  running with no drivers.
6    Q.   Once again, do you have an
7  example of a specific job that Angelo
8  failed to manage?
9    A.   My answer didn't change.
10    Q.   There is an allegation in the
11  May 28, 2019 letter that Angelo was not
12  knowledgeable of the project assigned to
13  him, is that allegation accurate?
14    A.   Yes.
15    Q.   Why do think that allegation is
16  accurate?
17    A.   Because he didn't know.
18    Q.   What didn't he know?
19    A.   Specifics on the job.  Whenever
20  he got asked, he didn't know.  He wasn't
21  involved.
22    Q.   Did you ask him about
23  specifics?
24    A.   At that time, yes.
25    Q.   Give me an example of a

9 (Pages 30 - 33)

Page 34

```
1              S. GOLD
2  specific that you asked for that he didn't
3  know.
4      A.   Production on the job, how is
5  job going, details.  We have our weekly
6  meetings, we discuss every single job, how
7  it is going, how it is doing.  He said
8  himself, "I didn't visit the job the last
9  two weeks."
10     Q.   Which job?
11         MR. JOSEPH:  Objection.
12     A.   Again, I don't know.
13     Q.   So, is it your testimony at one
14 or more weekly meetings Angelo Lopes
15 demonstrated a lack of knowledge of a
16 project that was assigned to him?
17     A.   Yes.
18     Q.   Can you give me the names of
19 people that witnessed Angelo demonstrate a
20 lack of knowledge of the project assigned
21 to him?
22     A.   Whoever was attending the
23 meetings.
24     Q.   Who attended these meetings?
25         MR. JOSEPH:  Objection.
```

Page 35

```
1              S. GOLD
2          You can answer.
3      A.   All the office employees.
4      Q.   Give me names.
5      A.   Maritza, at that time, Eli
6  Nickburg, Roy Katzman, Jose Arias, Charo
7  Lopez.
8      Q.   Did you ever complain to anyone
9  about Angelo's work?
10     A.   Yes.
11     Q.   Who did you complain to?
12     A.   To Moshe Gold.
13     Q.   Anyone else?
14     A.   No.
15     Q.   Do you have any idea who could
16 have written this letter if it wasn't you?
17         MR. JOSEPH:  Objection.
18         You can answer.
19     A.   I don't know.  Probably -- I
20 don't know.
21     Q.   Do you think it could have been
22 Maritza?
23         MR. JOSEPH:  Objection, asked
24     and answered.
25     A.   No, Maritza is not involved in
```

Page 36

```
1              S. GOLD
2  any salary paid people.
3      Q.   What are Maritza's
4  responsibilities?
5      A.   They are accounts receivable.
6      Q.   Does the company have an office
7  manager?
8      A.   No.
9      Q.   There is an allegation in the
10 May 28, 2019 letter that Angelo is not
11 providing the office with proper paperwork
12 to ensure jobs are handled properly, is
13 that allegation accurate?
14     A.   Again the question, please.
15     Q.   There is an allegation that
16 Angelo was not providing the office with
17 proper paperwork to ensure jobs are handled
18 properly, is that allegation accurate?
19     A.   Yes.
20     Q.   How do you know it's accurate?
21     A.   Because, again, the paperwork
22 was supposed to come to me.
23     Q.   What paperwork did Angelo fail
24 to provide you?
25     A.   The proposal, as I mentioned
```

Page 37

```
1              S. GOLD
2  before, production on the field as I
3  mentioned before, the communication with
4  the clients.
5      Q.   Do you remember any specific
6  example of Angelo failing to provide you
7  with this paperwork?
8      A.   I just gave you specifics.
9      Q.   A specific example, a job, a
10 time, a date, an approximate date?
11     A.   My answer still didn't change.
12     Q.   There is an allegation that,
13 "Office work hours are Monday through
14 Friday, seven a.m. to four p.m., and
15 Angelo's presence in the office is very
16 limited, however, we don't have much going
17 on in the field currently," is that
18 allegation accurate?
19     A.   Yes.
20     Q.   How do you know that is
21 accurate?
22     A.   Because I'm supervising every
23 job.
24     Q.   Was every office worker
25 required to be in the office Monday through
```

10 (Pages 34 - 37)

S. GOLD

1
2 Friday, seven a.m. to four p.m.?
3    A.   Yes.
4    Q.   Were you in the office at seven
5 a.m.?
6    A.   Sometimes on jobs and Angelo
7 was also sometimes on jobs and there is
8 others, also.  Some people, they work in
9 the office and some only in the field.
10    Q.   It is fair to say Angelo worked
11 in the office as well as the field,
12 correct?
13    A.   Yes.
14    Q.   Do you remember if after this
15 letter was given to Angelo did he start
16 arriving at the office and working from
17 seven a.m. to four p.m.?
18    A.   He hardly appeared in the
19 office at that time.
20    Q.   After this letter was given to
21 him, written warning, did his attendance at
22 the office improve?
23    A.   No.  At that time he was hardly
24 in the office.  He came maybe once a week.
25    Q.   Are you saying that after

S. GOLD

1
2 Angelo was given the May 28, 2019 written
3 warning, that even after being warned about
4 not being in the office enough he still
5 wasn't in the office enough?
6    A.   After the warning he even came
7 in less than before.
8        Can I get a two-minute break?
9    Q.   Sure.
10        (Whereupon, a short recess was
11    taken.)
12    Q.   I want to turn your attention
13 back to the May 28, 2019 written warning to
14 Angelo.
15        There is an allegation that
16 Angelo engaged in insubordination to upper
17 management, is that allegation accurate?
18    A.   Which allegation again, please?
19    Q.   Insubordination to upper
20 management.
21    A.   He didn't report with his
22 progress on the job.
23    Q.   Who was Angelo supposed to
24 report progress to?
25    A.   Biweekly meeting.  Everyone in

S. GOLD

1
2 the office needed to know.  From a billing
3 perspective, production perspective,
4 everyone needed to know exactly what is up
5 on the job.
6    Q.   Do you know if anyone at JLM
7 gave Angelo a verbal warning about failing
8 to report progress prior to giving him this
9 written warning?
10    A.   I didn't give any warnings to
11 salary paid employees.
12    Q.   Did you talk to Moshe about
13 Angelo not reporting progress?
14    A.   Yes.
15    Q.   Do you remember what you said
16 to Moshe?
17    A.   I said whatever we discussed
18 the past half-hour.
19    Q.   Did you complain to Moshe Gold
20 about each of these deficiencies documented
21 in the May 28, 2019 letter?
22    A.   In each one, I don't recall,
23 but some, yes.
24    Q.   Did you recommend that Moshe
25 take any particular action with respect to

S. GOLD

1
2 Angelo?
3    A.   I'm not in charge of any salary
4 paid employees.
5    Q.   Does JLM have a human resources
6 person?
7    A.   No.
8    Q.   Does JLM pay unemployment
9 insurance?
10        MR. JOSEPH:  Objection.
11        You can answer.
12    A.   I don't know the details.
13    Q.   Who works with the payroll
14 company, who at JLM works with the payroll
15 company?
16    A.   We give in the time sheets to
17 the payroll company.  They are a company,
18 they take care of it themselves.
19    Q.   Who at JLM interacts with the
20 payroll company?
21    A.   I approve the payroll and it
22 goes to them.
23    Q.   Who hired the payroll company?
24        MR. JOSEPH:  Objection.
25        You can answer.

Page 42

1           S. GOLD
2    A.   I don't know.
3    Q.   Does JLM keep a list of
4  employees at any particular time?
5         MR. JOSEPH:  Objection.
6         You can answer.
7    A.   Explain the question, please.
8    Q.   Did JLM possess any documents
9  that lists the names of its employees?
10   A.   Yes, it's in our payroll
11 company, so you can run any type of report
12 out of it, and every employee signs the
13 handbook and that is all being filed.
14   Q.   Do you review the paychecks
15 prior to Moshe signing them?
16   A.   Yes, I approve the time sheets.
17   Q.   Do you review the paychecks
18 themselves?
19   A.   The majority of the time, yes.
20   Q.   Is there any document, is there
21 a pay stub connected to the paycheck?
22   A.   Yes, it is a payroll company.
23 The payroll checks exactly whatever is
24 required by law.
25   Q.   What is the name of the payroll

Page 43

1           S. GOLD
2  company that JLM uses?
3    A.   Finger Check.
4    Q.   Has JLM used Finger Check since
5  2018?
6    A.   Yes.
7    Q.   To your knowledge, has JLM used
8  a company other than Finger Check at any
9  point?
10   A.   I don't know.
11   Q.   Have you taken any
12 antidiscrimination training at any point?
13   A.   No, we have our labor attorney
14 handles that.
15   Q.   Are you familiar with some of
16 the antidiscrimination laws in New York
17 State?
18   A.   Yes.
19        MR. JOSEPH:  Objection.
20        You can answer.
21   A.   Yes.
22   Q.   How did you become familiar
23 with the antidiscrimination laws in New
24 York State?
25   A.   Reading.

Page 44

1           S. GOLD
2    Q.   What did you read?
3    A.   Documents.
4    Q.   What type of documents?
5    A.   I don't recall the details.
6    Q.   Are you aware if there are any
7  justifications for terminating an employee
8  that are illegal?
9         MR. JOSEPH:  Objection.
10        You can answer.
11   A.   All terminations go through our
12 labor attorney.
13   Q.   My question to you is, are
14 there any justifications, to your
15 knowledge, where it would be illegal for a
16 company to terminate an employee?
17   A.   All terminations going to labor
18 attorney.  I guess they are doing their
19 job.  I'm not a lawyer.
20   Q.   Are you familiar with the New
21 York Labor Law?
22   A.   Yes.
23   Q.   Tell me what you know about the
24 New York Labor Law.
25        MR. JOSEPH:  Objection.

Page 45

1           S. GOLD
2         You can answer.
3    A.   If you can ask questions, I can
4  answer on it.
5    Q.   Are you aware if there is a
6  minimum wage in the State of New York?
7    A.   Yes.
8    Q.   How do you know that?
9    A.   Reviewing the minimum wage law.
10   Q.   Do you remember when you
11 reviewed the minimum wage law?
12        MR. JOSEPH:  Objection.
13        You can answer.
14   A.   Knowledge, it is healthy.
15   Q.   To your knowledge, are there
16 situations where a company is required to
17 pay overtime pay in the State of New York?
18   A.   Yes.
19   Q.   To your knowledge, when is a
20 company required to pay overtime in the
21 State of New York?
22   A.   When they work overtime.
23   Q.   What is considered overtime?
24   A.   More than 40 hours a week.
25   Q.   How did you become aware of

12 (Pages 42 - 45)

Page 46

S. GOLD
1
2 that?
3        MR. JOSEPH:  Objection.
4        You can answer.
5    A.   I review the labor law.
6    Q.   Did you review the labor laws
7 while Angelo Lopes was still employed at
8 JLM?
9    A.   Yes.  I reviewed before I even
10 got into this job.
11    Q.   You reviewed just for general
12 knowledge?
13    A.   Yes.
14    Q.   Do you know what the name
15 at-will employee means?
16        MR. JOSEPH:  Objection.
17        You can answer.
18    A.   Explain the question.
19    Q.   Have you ever heard the term
20 at-will employee?
21    A.   I don't recall.  If you can
22 explain, I can answer.
23    Q.   Does JLM have any employment
24 law posters at the office?
25    A.   Yes.

Page 47

S. GOLD
1
2    Q.   What poster does JLM have?
3    A.   The labor law.  I don't know
4 the exact name of that, but it's a legal
5 poster that is supposed to be in every
6 office.
7    Q.   Is it the New York Labor Law
8 poster?
9    A.   Yes.
10    Q.   Have you ever read that poster
11 before?
12    A.   Yes, it is in my eyes every
13 day.
14    Q.   Did JLM have that poster on the
15 wall while Angelo Lopes was still employed?
16    A.   Yes, that's part of the
17 company's furniture.
18    Q.   While Angelo Lopes was still
19 employed, had you read that poster?
20    A.   You asking me for the date when
21 I read it, I don't recall.
22    Q.   Had you read the poster while
23 Angelo was still employed by the company?
24    A.   I don't know.
25    Q.   Can you read me what the poster

Page 48

S. GOLD
1
2 says?
3        MR. JOSEPH:  You want him to
4 read the entire labor law poster to
5 you?
6        MR. STOCKMAN:  The title of the
7 poster.
8        MR. JOSEPH:  I object to that.
9 I don't see a purpose for that.
10        If you want us to produce
11 certain documents you can put in a
12 request in writing after the
13 deposition is over.
14        MR. STOCKMAN:  Well, the
15 relevance is willfulness.
16        MR. JOSEPH:  Right.  If you
17 want to request that we produce
18 certain documents, put the request in
19 writing and we will do so.
20        MR. STOCKMAN:  I have requested
21 documents which you have not
22 responded to my request.
23    Q.   Can you tell me the title of
24 the poster?
25        I'm not asking for you to read

Page 49

S. GOLD
1
2 the entire contents of the poster.
3        MR. JOSEPH:  Objection.
4        You can answer.
5    A.   I don't have the poster in
6 front of me so I can't.
7    Q.   I want to turn your attention
8 to the document that is marked Plaintiff's
9 Exhibit C.
10        MR. JOSEPH:  June 20, 2019
11 letter, correct?
12        MR. STOCKMAN:  Yes.
13    Q.   Can you please review the June
14 20, 2019 letter and let me know when you
15 finish reviewing the document.
16    A.   Yes.
17    Q.   You finished reviewing the
18 document?
19    A.   Correct.
20    Q.   Have you ever seen this
21 document before?
22    A.   I reviewed it before I got in.
23    Q.   What do you recognize that
24 document to be?
25    A.   It says on top, "Termination

13 (Pages 46 - 49)

Page 50

1            S. GOLD
2  Letter."
3      Q.   Did you write this letter?
4      A.   No.
5      Q.   Did you participate in the
6  drafting of this letter?
7      A.   No.
8      Q.   There is an allegation in the
9  letter that Angelo was terminated for gross
10 misconduct.  Is that an accurate allegation
11 that Angelo engaged in gross misconduct?
12     A.   Yes.
13     Q.   How did Angelo engage in gross
14 misconduct?
15     A.   The other letter that we
16 reviewed before spelled out are exact more
17 in detail.  The May 29th letter.
18     Q.   Did you talk to Moshe about
19 this letter before it was sent out to
20 Angelo?
21     A.   I'm not in charge of any salary
22 employee.
23     Q.   My question is, did you talk to
24 Moshe about the letter before it was sent
25 to Angelo?

Page 51

1            S. GOLD
2      A.   About this specific letter, the
3  answer is no.
4      Q.   How do you think Moshe knew
5  that Angelo engaged in gross misconduct?
6          MR. JOSEPH:  Objection.
7      You can answer.
8      A.   Everyone in the office is
9  reporting to him.  It is basically a
10 puzzle.  If there is pieces missing, they
11 missing.
12     Q.   Did you indicate to Moshe that
13 Angelo engaged in gross misconduct?
14     A.   Yes.
15     Q.   In between the May 28th written
16 warning and this June 20th letter, did you
17 complain to Moshe about Angelo's
18 performance?
19     A.   I don't recall the exact date
20 so I can't answer.
21     Q.   My question is, after Angelo
22 had been warned in writing, did you
23 thereafter complain to Moshe that, hey,
24 Angelo is still not improving?
25     A.   I don't recall the window May

Page 52

1            S. GOLD
2  28th and June 20th when I spoke to him.  It
3  was very obvious, he wasn't around.  No
4  need to tell him anything.
5      Q.   What do you mean by it is very
6  obvious he wasn't around?
7      A.   He wasn't in the office.
8          MR. STOCKMAN:  Another two
9      minutes.  I just want to take a
10     two-minute break and then we're
11     almost done.
12         (Whereupon, a brief recess was
13     taken.)
14         MR. STOCKMAN:  Thank you.  I
15     have nothing further.
16         MR. JOSEPH:  Thank you,
17     everyone.
18         (Whereupon, at 5:02 P.M., the
19     Examination of this witness was
20     concluded.)
21
22        o       o       o       o
23
24
25

Page 53

1            S. GOLD
2        D E C L A R A T I O N
3
4      I hereby certify that having been
5  first duly sworn to testify to the truth, I
6  gave the above testimony.
7
8      I FURTHER CERTIFY that the foregoing
9  transcript is a true and correct transcript
10 of the testimony given by me at the time
11 and place specified hereinbefore.
12
13
14
          _____
15            SAM GOLD
16
17
18 Subscribed and sworn to before me
19 this _____ day of _____ 20___.
20
21
     _____
22    NOTARY PUBLIC
23
24
25

Page 54

```
 1              S. GOLD
 2         I N D E X
 3
 4 EXAMINATION BY              PAGE
 5 MR. STOCKMAN               4
 6
 7
 8   INFORMATION AND/OR DOCUMENTS REQUESTED
 9 INFORMATION AND/OR DOCUMENTS       PAGE
10 (None)
11
12
13      QUESTIONS MARKED FOR RULINGS
14 PAGE LINE QUESTION
15 (None)
16
17
18
19
20
21
22
23
24
25
```

Page 56

ERRATA SHEET
VERITEXT/NEW YORK REPORTING, LLC

CASE NAME: Lopes v. JLM Decorating NYC Inc Et Al
DATE OF DEPOSITION: 2/11/2021
WITNESSES' NAME: Sam Gold

```
 5 PAGE  LINE (S)    CHANGE        REASON
 6 _____
 7 _____
 8 _____
 9 _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21          Sam Gold
                  _____
22 SUBSCRIBED AND SWORN TO BEFORE ME
   THIS ____ DAY OF _____, 20__.
23
24 _____
25 (NOTARY PUBLIC)          MY COMMISSION EXPIRES:
```

Page 55

```
 1              S. GOLD
 2         C E R T I F I C A T E
 3
 4 STATE OF NEW YORK     )
                    : SS.:
 5 COUNTY OF RICHMOND    )
 6
 7      I, KELLI PASSALACQUA, a Notary Public
 8 for and within the State of New York, do
 9 hereby certify:
10      That the witness whose examination is
11 hereinbefore set forth was duly sworn and
12 that such examination is a true record of
13 the testimony given by that witness.
14      I further certify that I am not
15 related to any of the parties to this
16 action by blood or by marriage and that I
17 am in no way interested in the outcome of
18 this matter.
19      IN WITNESS WHEREOF, I have hereunto
20 set my hand this 24th day of February 2021.
21
22
23 _____
        KELLI PASSALACQUA
24
25
```

15 (Pages 54 - 56)

[& - break]                                                                    Page 1

| **&** | **4** | 36:10,16,23 37:6 | 34:2 35:23 |
|---|---|---|---|

**&**  3:17

**4**  54:5
**40**  45:24

**0**

**00314**  1:6

**1**

**1**  3:17
**10004**  2:6
**10952**  4:13
**11**  1:13
**11042**  2:13
**13**  4:12
**1710**  2:5

**2**

**2/11/2021**  56:3
**20**  1:6 49:10,14
  53:19 56:22
**2018**  6:4,8 43:5
**2019**  6:3,11 29:17
  29:23 30:3 32:13
  33:11 36:10 39:2
  39:13 40:21 49:10
  49:14
**2021**  1:13 55:20
**20th**  51:16 52:2
**24722**  55:22
**24th**  55:20
**28**  29:17,23 30:2
  32:13 33:11 36:10
  39:2,13 40:21
**28th**  51:15 52:2
**29th**  50:17

**3**

**30**  3:16
**3000**  2:13
**32**  2:5
**3:33**  1:14
**3w8**  2:13

**5**

**5:02**  52:18

**a**

**a.m.**  37:14 38:2,5
  38:17
**absolutely**  15:20
  28:17
**accounts**  36:5
**accurate**  16:5
  21:21 23:23 30:22
  32:16 33:13,16
  36:13,18,20 37:18
  37:21 39:17 50:10
**acquire**  20:10
**action**  4:25 5:11
  40:25 55:16
**address**  4:11
**administer**  3:11
**ago**  4:23 20:25
**agreed**  3:5,20
**ahead**  31:9
**al**  56:2
**allegation**  30:19
  30:22 32:12,16
  33:10,13,15 36:9
  36:13,15,18 37:12
  37:18 39:15,17,18
  50:8,10
**angelo**  1:3 2:5,18
  4:15 5:17 6:2 12:6
  12:9,13,17,22 13:2
  13:7,10 16:8 17:4
  21:2,14,18,22 23:9
  23:20,25 26:7,11
  26:25 27:7 30:10
  31:20 32:13,18
  33:7,11 34:14,19

38:6,10,15 39:2,14
39:16,23 40:7,13
41:2 46:7 47:15
47:18,23 50:9,11
50:13,20,25 51:5
51:13,21,24
**angelo's**  35:9
37:15 51:17
**answer**  5:4 7:10
7:19,24 8:14 10:2
10:7,13,24 11:6
12:20 13:17,20,22
14:12,15,23 17:13
19:23 20:5,23
23:6 24:12 25:3
25:23 26:4 29:11
30:17 33:9 35:2
35:18 37:11 41:11
41:25 42:6 43:20
44:10 45:2,4,13
46:4,17,22 49:4
51:3,7,20
**answered**  27:5
35:24
**antidiscrimination**
23:4,14,25 43:12
43:16,23
**anyone's**  25:18
**appeared**  38:18
**apply**  24:14 28:15
**approve**  9:9,14
41:21 42:16
**approved**  31:11
31:21,25 32:8
**approximate**
37:10
**arias**  8:24 35:6
**arriving**  38:16
**asked**  12:24 13:2,6
13:10,12,24 33:20

**asking**  25:4 47:20
48:25
**assigned**  32:14,25
33:12 34:16,20
**attend**  17:11,24
**attendance**  38:21
**attended**  34:24
**attending**  34:22
**attention**  29:13
39:12 49:7
**attorney**  4:15
43:13 44:12,18
**attorneys**  2:4,9
**authority**  21:25
**authorized**  3:11
**available**  28:7
**avenue**  2:13
**aware**  25:16 44:6
45:5,25

**b**

**b**  29:15
**bachelor's**  17:15
**back**  13:19,22
39:13
**based**  14:17
**basically**  31:6 51:9
**began**  9:24 18:23
20:8
**begun**  25:9
**behalf**  11:4
**believe**  16:3
**beyond**  15:6 31:7
**billing**  40:2
**biweekly**  39:25
**blinds**  1:8 2:11
26:21,24
**blood**  55:16
**books**  15:14
**break**  39:8 52:10

**brett** 2:14
**brief** 52:12
**broadway** 2:5
**brought** 27:16
**budget** 15:6,8,12
**business** 18:11

### c

**c** 2:2 49:9 53:2
55:2,2
**called** 4:2 28:6
**calls** 28:8
**candidate** 28:11
28:19,23
**care** 41:18
**case** 1:5 56:2
**cash** 11:12 26:12
26:14,16,19,22
27:3
**certain** 48:11,18
**certification** 3:8
**certify** 53:4,8 55:9
55:14
**change** 33:9 37:11
56:5
**chaplain** 17:23
**charge** 41:3 50:21
**charo** 35:6
**check** 25:15 43:3,4
43:8
**checks** 11:9 42:23
**city** 1:8 2:11 26:21
26:23
**civil** 1:19
**clear** 29:8
**clients** 37:4
**clock** 9:17,17,18
9:21 10:15
**closed** 19:2,6,7
**collect** 31:16
**college** 17:11,24
18:5,7,12,13,15

**come** 22:17 28:4
36:22
**comes** 15:15 28:11
28:14
**coming** 27:25
**commercial** 19:3
19:16,20 20:3,7,17
20:20
**commission** 56:25
**communication**
37:3
**companies** 25:25
**company** 9:16
19:17 22:20 23:16
23:19,24 24:4,9
25:21 26:14 27:2
31:11,13,16,17,18
36:6 41:14,15,17
41:17,20,23 42:11
42:22 43:2,8
44:16 45:16,20
47:23
**company's** 47:17
**complain** 26:7,11
27:5 35:8,11
40:19 51:17,23
**complained** 27:2
**complaints** 27:8
**concluded** 52:20
**connected** 42:21
**considered** 45:23
**consist** 6:22 22:15
**construction** 5:5
**contain** 23:3
**containment** 19:2
19:6,7
**contents** 49:2
**contract** 31:7
**contractor** 26:22
**contractors** 10:22
11:3

**control** 6:23 19:8
**copy** 3:14,17
**corporation** 1:7
2:10
**correct** 5:24 9:12
14:11 38:12 49:11
49:19 53:9
**cosmopolitan** 1:7
2:10 25:21 26:18
26:20
**cost** 19:8
**counsel** 3:6,17
**county** 55:5
**courses** 18:12
**court** 1:2 3:13
**currently** 18:20
37:17
**customer** 32:2,7
**customers** 31:22
32:9
**cv** 1:6

### d

**d** 3:2 4:2 53:2 54:2
**daily** 7:3,11
**date** 1:13,20 18:17
30:8 37:10,10
47:20 51:19 56:3
**day** 9:17,24 15:23
47:13 53:19 55:20
56:22
**days** 3:16
**dealing** 11:25
**decides** 28:12
**decorating** 1:7,7
2:10,10 4:17 56:2
**defendant** 1:17
5:14
**defendants** 1:10
2:9 4:18
**deficiencies** 40:20

**definitely** 14:24
31:10
**degree** 17:16,18
17:19,22 18:8
**deliver** 12:11,13
28:21
**demonstrate**
34:19
**demonstrated**
34:15
**depends** 9:6 14:3
16:13
**deposed** 4:19,22
5:2,14
**deposition** 1:17
3:8,9,14 48:13
56:3
**detail** 16:14 50:17
**detailed** 16:14
**details** 17:3 22:22
22:23 34:5 41:12
44:5
**determination**
9:14 21:23 28:22
28:25 29:4
**determine** 9:23
15:11,18
**determines** 11:23
27:20,24
**diego** 9:2
**difference** 26:2,5
**different** 14:4
25:24,25
**direction** 31:8
**discuss** 34:6
**discussed** 40:17
**dispute** 5:5
**district** 1:2,2
**document** 12:15
15:22,23,25 16:7,9
29:14 42:20 49:8

49:15,18,21,24
**documentary** 14:20
**documented** 15:3 40:20
**documents** 15:17 15:24 42:8 44:3,4 48:11,18,21 54:8,9
**doing** 12:25 13:3 34:7 44:18
**dollar** 15:15,16
**drafting** 50:6
**drivers** 33:5
**duly** 4:3 53:5 55:11
**duties** 19:4

**e**

**e** 2:2,2 3:2,2 53:2 54:2 55:2,2
**eastview** 4:12
**effect** 3:12,15
**elaborate** 13:15
**eli** 35:5
**employed** 12:7,10 23:10,21 24:2 46:7 47:15,19,23
**employee** 25:11,16 42:12 44:7,16 46:15,20 50:22
**employees** 10:21 10:25 22:2,3 29:9 35:3 40:11 41:4 42:4,9
**employment** 21:23 46:23
**engage** 50:13
**engaged** 39:16 50:11 51:5,13
**ensure** 36:12,17
**entire** 48:4 49:2

**errata** 56:1
**esq** 2:6,14
**et** 56:2
**evidence** 14:21,25 15:2
**exact** 17:10 18:3 18:17 21:16 30:8 47:4 50:16 51:19
**exactly** 40:4 42:23
**examination** 4:6 52:19 54:4 55:10 55:12
**examined** 4:5
**example** 30:25 32:3,5,6 33:7,25 37:6,9
**examples** 31:5 32:21
**exhibit** 29:15 49:9
**experience** 20:2
**expires** 56:25
**explain** 5:12 8:7 13:18 19:24 31:13 42:7 46:18,22
**extent** 9:6,7
**extra** 31:6
**eyes** 47:12

**f**

**f** 3:2 55:2
**fact** 14:16
**fail** 32:18 36:23
**failed** 12:13 33:8
**failing** 37:6 40:7
**fair** 38:10
**familiar** 5:17,20 43:15,22 44:20
**father** 20:16 24:8
**february** 1:13 55:20
**federal** 1:19 4:16

**field** 7:12,25 8:3 27:17 28:7 29:6 31:9,16,23 32:15 37:2,17 38:9,11
**filed** 42:13
**filing** 3:7
**fill** 10:15
**finger** 43:3,4,8
**finish** 49:15
**finished** 49:17
**first** 4:3 19:16 30:6 53:5
**following** 30:20,25
**follows** 4:5
**force** 3:15
**foregoing** 53:8
**form** 3:21
**formally** 24:19
**forth** 55:11
**four** 37:14 38:2,17
**friday** 37:14 38:2
**friend** 24:18,18 27:18,18
**front** 10:18 29:20 49:6
**furniture** 47:17
**further** 3:20 13:15 52:15 53:8 55:14

**g**

**g** 4:2
**general** 46:11
**give** 12:12 22:16 23:8 32:3,6,21 33:25 34:18 35:4 40:10 41:16
**given** 26:8 30:10 38:15,20 39:2 53:10 55:13
**giving** 40:8
**go** 10:14 31:9 44:11

**goes** 15:16 41:22
**going** 28:2 34:5,7 37:16 44:17
**gold** 1:8,8,8,9,18 2:11,11,11,12 4:1 4:10,14 5:1 6:1 7:1 8:1 9:1 10:1 11:1,10 12:1 13:1 13:4 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1,9 25:1 26:1 27:1 28:1 29:1,22 30:1 31:1 32:1 33:1 34:1 35:1,12 36:1 37:1 38:1 39:1 40:1,19 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1,15 54:1 55:1 56:3,21
**good** 13:14 14:2 14:13,21 15:19
**graduate** 18:14
**gross** 50:9,11,13 51:5,13
**group** 2:9
**guess** 12:5 44:18
**guy** 29:6
**guys** 7:25 8:2 9:9 9:10 31:8,15

**h**

**half** 40:18
**hand** 55:20
**handbook** 22:16 22:17,18,21,24 23:3,8,12,17,20,24 24:5,10 42:13

[handled - letter]                                                    Page 4

**handled**  36:12,17
**handles**  43:14
**happened**  20:25
  31:12 32:4
**head**  17:3 18:17
  32:11,23
**healthy**  45:14
**heard**  46:19
**heart**  8:15 23:2
**held**  1:20
**help**  30:12
**helped**  30:14
**hereinbefore**
  53:11 55:11
**hereunto**  55:19
**hey**  51:23
**hire**  22:2 27:11
**hired**  22:6 27:13
  28:15,19 41:23
**hires**  27:15 28:2
**hiring**  22:14
**hour**  40:18
**hours**  37:13 45:24
**human**  41:5

**i**

**idea**  26:23 35:15
**illegal**  44:8,15
**improve**  38:22
**improving**  51:24
**including**  32:14
**independent**  10:21
  11:3
**indicate**  51:12
**individual**  28:12
**industry**  19:21
  20:3,7,17,21
**information**  15:4
  15:14,18 16:4
  23:4,13 24:5 54:8
  54:9

**insubordination**
  39:16,19
**insurance**  41:9
**interaction**  7:14
**interacts**  41:19
**interested**  55:17
**interior**  1:7 2:10
  25:21
**intervened**  22:9
**interviewed**  24:20
**involved**  9:5,7
  12:17 25:18 33:21
  35:25

**j**

**jlm**  1:7,7 2:10,10
  4:16 5:23 6:7,10
  6:14 7:5,8,17,22
  8:9,18 9:23 10:20
  11:2,4,9,11 12:7
  12:10 17:5,9
  18:23 19:16 20:8
  20:21 21:22 22:2
  22:15,16 23:8,10
  23:21 24:2,15,21
  24:23,25 25:6,9,13
  25:17,20 26:6,15
  26:24,24 27:3,10
  27:21,23 28:2,12
  28:16 29:9 40:6
  41:5,8,14,19 42:3
  42:8 43:2,4,7 46:8
  46:23 47:2,14
  56:2
**job**  6:10,24 7:2,6
  7:11 10:9 11:16
  11:20 14:6,7,19
  15:5,9,12 18:22,25
  19:4 22:18 27:11
  27:22 28:9,9,11,13
  28:15,19,23 33:3,4
  33:4,7,19 34:4,5,6

  34:8,10 37:9,23
  39:22 40:5 44:19
  46:10
**jobs**  6:18,19,21
  13:11,12,25 14:10
  15:3,5,8 36:12,17
  38:6,7
**joel**  1:8 2:11
**jon**  2:4,6 4:14
**jose**  8:24 35:6
**joseph**  2:14 5:3
  7:9,18,23 8:13
  9:25 10:6,12,23
  11:5 12:19 13:16
  14:14,22 16:17
  17:12 19:22 20:22
  22:25 23:5 24:11
  25:2,22 26:3
  29:10,16,19 30:16
  34:11,25 35:17,23
  41:10,24 42:5
  43:19 44:9,25
  45:12 46:3,16
  48:3,8,16 49:3,10
  51:6 52:16
**judge**  3:13
**june**  49:10,13
  51:16 52:2
**justifications**  44:7
  44:14

**k**

**k**  1:8,9,9 2:11,12
  2:12
**katzman**  8:21,23
  35:6
**keep**  6:23,23 42:3
**kelli**  1:21 55:7,23
**knew**  51:4
**know**  5:7 7:16,21
  8:15 11:8,17 12:6
  17:2,10 18:3 20:4

  20:24 21:2,5,9
  23:2 24:4,8,13,17
  26:5,20 27:4
  30:14 32:9,22
  33:17,18,20 34:3
  34:12 35:19,20
  36:20 37:20 40:2
  40:4,6 41:12 42:2
  43:10 44:23 45:8
  46:14 47:3,24
  49:14
**knowledge**  10:20
  11:2,13 20:6,11
  25:20 26:15,19
  27:9 34:15,20
  43:7 44:15 45:14
  45:15,19 46:12
**knowledgeable**
  33:12
**known**  20:20

**l**

**l**  3:2,2 4:2 53:2
**labor**  43:13 44:12
  44:17,21,24 46:5,6
  47:3,7 48:4
**labuda**  2:9
**lack**  34:15,20
**lake**  2:13
**language**  23:25
**law**  2:4,9 42:24
  44:21,24 45:9,11
  46:5,24 47:3,7
  48:4
**laws**  23:4,14 43:16
  43:23 46:6
**lawsuit**  4:16,25
  5:13,15
**lawyer**  44:19
**legal**  47:4
**letter**  29:17,23,24
  30:3,7,9,12,15,20

**[letter - page]**

31:10 32:13 33:11
35:16 36:10 38:15
38:20 40:21 49:11
49:14 50:2,3,6,9
50:15,17,19,24
51:2,16
**limited**   32:15
37:16
**line**   54:14 56:5
**list**   42:3
**lists**   42:9
**llc**   56:1
**longer**   12:7,9
**look**   15:17,21
**lopes**   1:3 2:5,18
4:16 5:18 6:2 12:6
12:13,18,23 21:2
23:9,20 24:2 26:7
26:11,25 30:20,25
34:14 46:7 47:15
47:18 56:2
**lopez**   35:7
**losing**   31:17
**lost**   31:11,14
**lot**   15:4 24:16

**m**

**m**   4:2
**major**   18:4,7
**majority**   42:19
**manage**   6:18,21
32:19 33:8
**managed**   13:11,13
13:25 15:6
**management**
39:17,20
**manager**   28:9
36:7
**managing**   32:14
32:25
**marcus**   2:13

**maritza**   1:9,9 2:12
2:12 35:5,22,25
**maritza's**   36:3
**marked**   29:14,15
49:8 54:13
**marriage**   55:16
**master's**   17:18,21
**material**   31:19
**matter**   55:18
**mean**   8:10 9:11
28:13 32:24 33:2
52:5
**means**   46:15
**mechanic**   11:18
11:21
**meet**   22:19,20
**meeting**   30:4
39:25
**meetings**   34:6,14
34:23,24
**mentioned**   16:3,6
17:7 27:17 36:25
37:3
**milman**   2:9
**minimum**   24:6
45:6,9,11
**minute**   39:8 52:10
**minutes**   52:9
**misconduct**   50:10
50:11,14 51:5,13
**missing**   15:4 16:4
51:10,11
**moment**   9:4 14:18
15:10
**monday**   37:13,25
**money**   31:11,14
31:16
**monitor**   10:10
**monsey**   4:12
**moshe**   1:8 2:11
11:10 13:4,6,10,12

13:24 24:9 35:12
40:12,16,19,24
42:15 50:18,24
51:4,12,17,23

**n**

**n**   2:2 3:2 53:2 54:2
**n.y.**   1:8 2:11
**name**   4:8,14 5:7
32:23 42:25 46:14
47:4 56:2,3
**named**   4:17 5:14
**names**   7:16,21
8:12,16,17,20
25:24 32:9 34:18
35:4 42:9
**nature**   4:24
**need**   11:22 20:4
22:18,19,20 52:4
**needed**   7:15 40:2,4
**never**   26:16,18
31:9
**new**   1:2,22 2:6,6
2:13 4:4,12 43:16
43:23 44:20,24
45:6,17,21 47:7
55:4,8 56:1
**nickburg**   35:6
**nope**   30:13
**notary**   1:22 4:3
53:22 55:7 56:25
**notice**   1:19
**ny**   1:7 2:10
**nyc**   1:7 2:10 56:2

**o**

**o**   3:2 4:2 53:2
**oath**   3:12
**object**   48:8
**objection**   5:3 7:9
7:18,23 8:13 9:25
10:6,12,23 11:5

12:19 13:16 14:14
14:22 16:17 17:12
19:22 20:22 22:25
23:5 24:11 25:2
25:22 26:3 29:10
30:16 34:11,25
35:17,23 41:10,24
42:5 43:19 44:9
44:25 45:12 46:3
46:16 49:3 51:6
**objections**   3:21
**obvious**   52:3,6
**office**   2:4 16:11,12
16:21,24 17:5
21:8,10,15 22:3
27:14,17,25 28:4
28:11,14 30:21,25
35:3 36:6,11,16
37:13,15,24,25
38:4,9,11,16,19,22
38:24 39:4,5 40:2
46:24 47:6 51:8
52:7
**okay**   31:23
**old**   18:20
**once**   33:6 38:24
**operations**   6:9,13
6:17,25 7:13
32:15
**original**   3:9,17
**osha**   22:19
**outcome**   55:17
**overall**   20:5
**overtime**   45:17,20
45:22,23

**p**

**p**   2:2,2 3:2
**p.m.**   1:14 37:14
38:2,17 52:18
**page**   54:4,9,14
56:5

paid   11:12 24:23
   24:25 25:4,5,8,10
   26:12,14,16,18,21
   36:2 40:11 41:4
painter   9:24 10:4
   10:10 11:12 22:6
   24:14 26:13,16,19
   28:4
painter's   9:15
painters   7:14,17
   7:22 9:11,18
   10:21 11:19,24
   12:2,4 22:4,9,15
   23:9 24:19 26:8
   26:12 27:3,11
   28:3 29:12
painting   6:20 11:3
   19:17,20 20:3,7,17
   20:20
paperwork   27:19
   28:5,6 36:11,17,21
   36:23 37:7
part   47:16
participate   50:5
particular   9:24
   27:25 28:23 40:25
   42:4
parties   3:7 55:15
party   5:8,10
passalacqua   1:21
   55:7,23
pay   25:19 26:8
   32:7 41:8 42:21
   45:17,17,20
paycheck   42:21
paychecks   42:14
   42:17
paying   27:3 31:18
payroll   9:5,8,16
   11:9 31:18 41:13
   41:14,17,20,21,23

42:10,22,23,25
people   20:12,13
   27:4 29:5 34:19
   36:2 38:8
perez   9:2
perform   11:3
performance
   51:18
person   27:25 41:6
perspective   40:3,3
pharmacy   19:3,9
   19:11
physically   7:2
pieces   51:10
place   28:6 31:8
   53:11
plaintiff   1:4,18 2:4
plaintiff's   29:15
   49:8
please   4:8 5:12
   18:6 24:24 36:14
   39:18 42:7 49:13
pllc   2:9
plug   15:13
point   11:11 43:9
   43:12
position   6:7 19:5
possess   17:22 42:8
poster   47:2,5,8,10
   47:14,19,22,25
   48:4,7,24 49:2,5
posters   46:24
presence   37:15
present   2:17
prior   19:13 20:21
   40:8 42:15
probably   20:18
   35:19
procedure   1:20
   16:10,12

procedures   16:21
   16:24 17:2,6
   30:21 31:2
process   22:14
produce   31:24
   48:10,17
production   16:2
   34:4 37:2 40:3
professional   17:19
   17:22
progress   39:22,24
   40:8,13
project   32:15,22
   33:12 34:16,20
projects   32:14,18
   32:25
proper   15:7 36:11
   36:17
properly   36:12,18
proposal   31:25
   32:8 36:25
proposals   30:21
   31:2,6,21
provide   13:25
   36:24 37:6
providing   36:11
   36:16
public   1:22 4:4
   53:22 55:7 56:25
purpose   48:9
pursuant   1:18
put   48:11,18
puzzle   51:10

q

qualifications
   19:19,25
qualified   28:20,24
quality   12:11,13
   28:21 29:6
question   5:12 8:7
   13:18,20,22 16:18

16:20 19:24 24:24
   36:14 42:7 44:13
   46:18 50:23 51:21
   54:14
questions   13:6,9
   45:3 54:13
quick   15:14
quit   21:3,9,18,20
   21:22

r

r   2:2 3:2 53:2 55:2
read   13:19,22
   22:21 23:16,19,24
   24:3,9 30:4,6,9
   44:2 47:10,19,21
   47:22,25 48:4,25
reading   43:25
really   7:20
reason   56:5
reasons   28:18
recall   5:9 11:7
   14:7 15:9 18:10
   18:16 20:18,24
   24:7 25:14 30:8
   30:11 40:22 44:5
   46:21 47:21 51:19
   51:25
receivable   36:5
recess   39:10 52:12
recognize   30:2
   49:23
recommend   12:22
   40:24
record   4:9 55:12
recording   10:11
records   25:15
reduced   25:13,17
referred   13:21
regarding   30:21
   31:2

[related - sworn]

related   55:15
relevance   48:15
remember   5:25
   8:17,20,22 13:5
   14:9 18:18 20:13
   20:19 21:13 26:25
   30:24 37:5 38:14
   40:15 45:10
rephrase   16:18
report   39:21,24
   40:8 42:11
reporter   13:23
reporting   40:13
   51:9 56:1
request   48:12,17
   48:18,22
requested   48:20
   54:8
required   37:25
   42:24 45:16,20
requires   6:24 7:4
   16:2
reserved   3:22
resources   41:5
respect   14:9 40:25
respective   3:6
responded   48:22
response   13:13
   14:2
responsibilities
   6:16 36:4
review   15:22
   29:23 42:14,17
   46:5,6 49:13
reviewed   45:11
   46:9,11 49:22
   50:16
reviewing   29:24
   45:9 49:15,17
richmond   55:5

right   15:4 48:16
road   4:12
rodriguez   1:9 2:12
roughly   4:23
roy   8:21,23 35:6
rules   1:19 22:19
   22:20
rulings   54:13
run   7:11 42:11
running   6:24 33:5
rx   19:12,14

**s**

s   2:2 3:2,2 4:1,2
   5:1 6:1 7:1 8:1 9:1
   10:1 11:1 12:1
   13:1 14:1 15:1
   16:1 17:1 18:1
   19:1 20:1 21:1
   22:1 23:1 24:1
   25:1 26:1 27:1
   28:1 29:1 30:1
   31:1 32:1 33:1
   34:1 35:1 36:1
   37:1 38:1 39:1
   40:1 41:1 42:1
   43:1 44:1 45:1
   46:1 47:1 48:1
   49:1 50:1 51:1
   52:1 53:1 54:1
   55:1 56:5
safety   22:19
salary   24:23,25
   25:5,8,10,12,17
   36:2 40:11 41:3
   50:21
sam   1:8,17 2:11
   4:10 29:19 53:15
   56:3,21
saw   21:6
saying   14:8 31:20
   38:25

says   48:2 49:25
schedule   32:16
sealing   3:7
see   21:7 48:9
seeing   21:10
seen   49:20
sent   31:10,20,24
   50:19,24
service   3:16
set   55:11,20
seven   18:21 37:14
   38:2,4,17
share   12:16
sheet   9:19,20,22
   10:3,15 56:1
sheets   41:16 42:16
shimmy   1:9 2:12
short   39:10
sign   22:18,21
   27:19 28:5
signature   55:22
signed   3:10,12,15
signing   42:15
signs   11:8 42:12
sime   1:9 2:12
single   34:6
site   10:9 11:16,20
sites   7:2,6
situation   14:3
situations   14:5
   45:16
southern   1:2
specialty   19:12,13
specific   15:9,18
   16:13 30:24 31:4
   33:7 34:2 37:5,9
   51:2
specifically   21:13
specifics   12:12,24
   12:25 14:6,7,9,18
   20:4 32:10 33:19

33:23 37:8
specified   53:11
spelled   50:16
spoke   20:14 52:2
ss   55:4
stand   18:2
start   10:11 38:15
started   10:5
state   1:22 4:4,8
   43:17,24 45:6,17
   45:21 55:4,8
states   1:2
stipulated   3:5,20
stockman   2:4,6
   4:7,15 13:19
   16:19 29:18 48:6
   48:14,20 49:12
   52:8,14 54:5
story   21:20
strike   16:19
stub   42:21
stubs   26:9
stuff   16:15,16
subscribed   53:18
   56:22
success   2:13
suing   5:8
suite   2:5,13
supervising   37:22
supervision   26:17
supervisor   7:5
   10:14,16,19
supervisors   7:8
   8:4,6,8,18 12:3
supposed   16:8
   36:22 39:23 47:5
sure   39:9
sworn   3:10 4:3
   53:5,18 55:11
   56:22

**system** 15:13
  27:10

**t**

**t** 3:2,2 53:2 55:2,2
**t&l** 16:2
**take** 18:11 40:25
  41:18 52:9
**taken** 1:18 39:11
  43:11 52:13
**talk** 14:4 20:16
  21:19 40:12 50:18
  50:23
**talking** 20:12
**team** 12:16
**tell** 15:14 21:17,20
  27:4,7 29:23 31:4
  44:23 48:23 52:4
**telling** 12:3
**term** 46:19
**terminate** 21:23
  44:16
**terminated** 12:23
  21:3 29:8 50:9
**terminating** 44:7
**termination** 12:18
  49:25
**terminations**
  44:11,17
**testified** 4:5
**testify** 53:5
**testimony** 34:13
  53:6,10 55:13
**thank** 52:14,16
**things** 14:12,21
  15:19
**think** 33:15 35:21
  51:4
**time** 1:14,20 3:22
  9:9,15,19,20,22
  10:3,11,15,17
  23:12 28:10 31:12

32:23 33:24 35:5
  37:10 38:19,23
  41:16 42:4,16,19
  53:10
**title** 6:10 48:6,23
**told** 21:6,11,14
  29:5
**tools** 11:15
**top** 17:3 18:16
  32:10,23 49:25
**training** 43:12
**transcript** 53:9,9
**trial** 3:22
**true** 53:9 55:12
**truth** 53:5
**truthfully** 10:10
**turn** 29:13 39:12
  49:7
**twenty** 18:21
**two** 4:23 25:24,24
  34:9 39:8 52:8,10
**type** 11:15 17:21
  19:19,25 42:11
  44:4
**types** 6:19

**u**

**u** 3:2
**ultimately** 28:15
**ultipro** 15:25
**understand** 12:25
**unemployment**
  41:8
**united** 1:2
**unsigned** 3:14
**upper** 39:16,19
**use** 11:19,21,22,24
  12:2,4 28:12
**uses** 43:2
**uts** 17:25 18:2

**v**

**v** 56:2
**verbal** 40:7
**veritext** 56:1
**view** 1:8 2:11
  26:21,23
**virtual** 1:21
**visit** 7:2 33:3 34:8

**w**

**wage** 24:6 45:6,9
  45:11
**waived** 3:9
**walk** 21:10
**walking** 21:8,14
**wall** 47:15
**want** 39:12 48:3
  48:10,17 49:7
  52:9
**warned** 39:3 51:22
**warning** 38:21
  39:3,6,13 40:7,9
  51:16
**warnings** 40:10
**way** 21:11 55:17
**ways** 24:16,17
**week** 15:22 38:24
  45:24
**weekly** 34:5,14
**weeks** 34:9
**went** 15:5
**whereof** 55:19
**willfulness** 48:15
**window** 51:25
**witness** 3:10,16,18
  4:2 29:21 52:19
  55:10,13,19
**witnessed** 34:19
**witnesses'** 56:3
**words** 21:16

**work** 5:6,6,21,22
  6:4 7:17,22 8:18
  10:3 11:4 12:11
  12:14,15,16 16:7,9
  19:11,14,20 20:2
  24:15 26:6,24
  27:12,21,22,23
  28:2,7,21 31:7,17
  31:24 32:7 35:9
  37:13 38:8 45:22
**worked** 5:25 19:9
  19:17 38:10
**worker** 27:13
  28:13,14 29:7
  37:24
**workers** 27:12,15
**workforce** 16:2
**working** 9:24 10:5
  17:4,8 18:23
  19:13 20:8,21
  24:20 25:9,13
  31:15 38:16
**works** 41:13,14
**write** 10:4,16,18
  30:12,14 50:3
**writing** 16:22,25
  17:6 48:12,19
  51:22
**written** 35:16
  38:21 39:2,13
  40:9 51:15

**x**

**x** 1:3,11 54:2

**y**

**year** 18:18,19
**years** 4:23 20:25
**york** 1:2,22 2:6,6
  2:13 4:4,13 43:16
  43:24 44:21,24
  45:6,17,21 47:7

**[york - zoom]**                                                  Page 9

| 55:4,8 56:1 |
| --- |
| **z** |
| **zoom**   1:21 |

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.