UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------

ANGELO LOPES,　　　　　　　　　　　　　　　　　　Index No. 20-cv-00314-DLC

　　　　　　　　　　Plaintiff,

　　　　　　　　　　　　　　　　　　　　　　　　**DECLARATION OF**
　　　　　　　　　　　　　　　　　　　　　　　　**ANGELO LOPES**
　　-against-

JLM DECORATING NYC INC, COSMOPOLITAN
INTERIOR NY CORPORATION, JLM DECORATING, INC.,
CITY VIEW BLINDS OF N.Y. INC.,
MOSHE GOLD, JOEL GOLD a/k/a SAM GOLD a/k/a
SHIMMY GOLD, and MARITZA RODRIGUEZ a/k/a MARITZA SIME

　　　　　　　　　　Defendants.
-----------------------------------------------------------------

I, **ANGELO LOPES,** declare under penalty of perjury, that the following is true and correct:

1. I am the plaintiff in this action.

2. This declaration is based upon my personal knowledge and a review of deposition transcripts, my May 28, 2019 written warning, and my termination letter.

3. I commenced employment with Moshe Gold in or around September, 2015.

4. Moshe Gold terminated my employment on June 14, 2019.

5. From my hiring through my termination, I was employed by Moshe Gold as a Vice President of Operations.

6. At the time of my termination, I was employed by Defendants JLM Decorating NYC Inc, Cosmopolitan Interior NY Corporation, JLM Decorating, Inc., and City View Blinds of N.Y. Inc. (collectively "the Corporate Defendants").

7. I was given a business card indicating that I was a representative of Cosmopolitan Interior NY.

1

8. I was given a business card indicating I was a representative of City View Blinds of N.Y. Inc.

9. Likewise, I was given another business card indicating I was a representative of JLM Decorating.

10. To the best of my knowledge, Moshe Gold was the sole owner of each of the Corporate Defendants.

11. The Corporate Defendants operated a contracting and renovation business.

## MY PERFORMANCE

12. As Vice President of Operations, my job duties involved obtaining commercial painting business for Moshe Gold's companies, going to job sites to review work, estimating, and making sure projects were running cost effectively. By any objective standard, I performed excellently.

13. Due to my experience in the commercial painting industry, I was well known and trusted.

14. While Moshe Gold may have been well known in the blinds industry, he wasn't well known for commercial painting. I was able to obtain significant commercial painting business for Moshe Gold based on my reputation in the commercial painting industry.

15. As Vice President of Operations, I was able to get Moshe Gold major multimillion dollar jobs involving large buildings in New York City.

16. As Vice President of Operations, I worked from the Corporate Defendants' office at 111 John St, New York, NY 10038 ("the office") and I also worked outside the office. My job responsibilities required me to meet with clients and potential clients outside the office and to visit job sites. Accordingly, even though I was in the office on a daily basis, I spent a significant portion of time working outside the office.

17. At no point in time did Moshe Gold or anyone else working for him give me sales goals.

18. At no point in time did Moshe Gold or anyone else working for him communicate to me that I was required to bring in three times my pay in sales.

19. Although I was never given sales goals and although I was never told I was required to bring in three times my pay in sales, I believe, to my best of my knowledge, that I brought in at least three times my pay in sales on an annual basis in 2016, 2017, and 2018. I believe that as of the time I was terminated, I had either already brought in three times my pay in sales in 2019 or, at the very least, I was on track to meet and exceed that number. Around the time I was terminated, I was in talks with a client about doing a job worth about 2.5 million dollars in sales.

20. Prior to being employed by the Corporate Defendants, I was a co-owner of Antovel Painting, a commercial painting company that employed workers in New York. Antovel Painting was one of the largest union commercial painting companies in New York.

21. Prior to being employed by the Corporate Defendants, I worked in the commercial painting industry for around 45 years.

22. Additionally, prior to being employed by the Corporate Defendants, I was on the Board of Governors in the Building Trade Association, I was the President and then Chairman of the Board of the Association of Master Painters, and was on other boards involved in the commercial painting industry.

23. Additionally, prior to being employed by the Corporate Defendants, I was Co-Chairman of the District Council 9 Painting Industry Insurance and Annuity Funds.

24. Based on owning a commercial painting company that employed workers in New York and based on my positions with the aforementioned organizations, I knew about certain New

York employment laws. Based on such experience, I knew (prior to being employed by Moshe Gold) that it was illegal for an employer in New York to pay an employee without providing the employee with a wage statement documenting the employee's pay rate and hours worked corresponding with the payment.

**BASIS OF BELIEF THAT THE PAY PRACTICES AT ISSUE VIOLATED THE LAW**

25. Prior to making my initial complaint about the Corporate Defendants' failure to provide wage statements to their painters in November, 2018, I initially learned that the Corporate Defendants were paying their painters in cash without providing wage statements from Jose Arias, who was employed by the Corporate Defendants as Project Manager and/or Job Supervisor.

26. After I received complaints from contractors about manpower, I questioned Mr. Arias why we were having manpower issues in or around November, 2018. Mr. Arias indicated to me that there were manpower issues because Defendant Joel Gold a/k/a Sam Gold a/k/a Shimmy Gold ("Sam Gold") wasn't paying painters what they were owed.

27. Mr. Arias explained to me in or around November, 2018 that on non-union jobs, painters working for the Corporate Defendants were now being paid in cash without any accompanying pay stub. Mr. Arias explained to me that on these jobs, there would be multiple foremen, each with a crew of painters, and that Sam Gold was giving Mr. Arias cash to pay the foremen and then the foremen were responsible for distributing the cash to their crew. Mr. Arias indicated to me that the painters weren't being paid properly because Sam Gold wasn't giving him enough cash to give to the foremen to pay the workers appropriately.

28. On a number of occasions after Jose Arias notified me about the Corporate Defendants' new pay practice of providing him cash to pay foremen who were then responsible for paying the painters, I personally witnessed Sam Gold place thousands of dollars in cash in envelopes and hand the envelopes to Jose Arias while we were in the office. On each of these occasions, I did not see Sam Gold place any wage statement in the respective envelope.

29. I knew that Mr. Arias was using the cash that I saw Sam Gold hand him to pay painters working for the Corporate Defendants because most or all of the times where I witnessed this transaction between Mr. Arias and Sam Gold, Mr. Arias informed me before he collected the cash from Sam Gold that he needed cash from Sam Gold to pay painters working for the Corporate Defendants.

30. I also knew that Mr. Arias was using the cash that I saw Sam Gold hand him to pay painters working for the Corporate Defendants because on a number of occasions where I witnessed this transaction between Mr. Arias and Sam Gold, Mr. Arias approached me afterwards and informed me that Sam Gold did not give him enough cash to pay painters what they were owed.

31. I estimate that between in or around November, 2018 and my termination in June, 2019, I personally witnessed Sam Gold place cash in an envelope and then hand the envelope to Mr. Arias on more than ten (10) occasions.

32. Notably, prior to Mr. Arias informing me about the Corporate Defendants' new pay practice of giving him cash to pay foremen who were then responsible for paying the painters, I used to see a stack of checks with accompanying pay stubs in the office on or

around payday. After Mr. Arias notified me about the Corporate Defendants' new pay practice, I noticed that the stack of checks in the office was substantially smaller.

33. I also believed that the Corporate Defendants paid painters in cash without furnishing an accompanying wage statement because I complained to Moshe Gold about this payment practice on a number of occasions and on each such occasion, Moshe Gold did not deny this was occurring.

34. Moreover, I complained to Sam Gold on a number of occasions about painters employed by the Corporate Defendants being paid in cash without being provided an accompanying wage statement and on each such occasion, Sam Gold did not deny this was occurring. In fact, on at least one occasion, after I complained to Sam Gold about this payment practice, he made a handcuff gesture.

35. Additionally, I complained to Maritza Rodriguez on a number of occasions about painters employed by the Corporate Defendants being paid in cash without being provided an accompanying wage statement and on each such occasion, Ms. Rodriguez did not deny this was occurring.

**MY COMPLAINTS**

36. On or about November 28, 2018, I complained to Moshe Gold about the Corporate Defendants' failure to give painters wage statements explaining how pay was calculated and showing the hourly rate of pay and overtime rate of pay. I complained to Moshe Gold that this practice of not giving wage statements explaining how pay was calculated and showing the hourly rate of pay and overtime rate of pay violated the law.

37. On or about January 8, 2019, I again complained to Moshe Gold that it was illegal not to provide pay stubs to painters working for him. I also complained that it was illegal to pay a

6

foreman to hire people off the street and pay them cash. With respect to my January 8, 2019 complaint, I not only described the illegal practice (failing to provide pay stubs), I also explained that such practice was illegal.

38. On or about February 15, 2019, I again complained to Moshe Gold about the Corporate Defendants' practice of not giving painters payroll checks or pay stubs. I also complained to Moshe Gold that the painters weren't even making minimum wage for the hours they were working.

39. On or about March 18, 2019, I once again complained to Moshe Gold that they had to start doing jobs legally. I once again recommended that they hire a legitimate sub-contractor, who would pay their workers by check and would give their workers wage statements containing the number of hours worked.

40. On or about April 17, 2019, I complained to Sam Gold that it was highly illegal to have a foreman pick people off the street to work on multimillion dollar projects and to pay the foreman cash or an expense check without providing wage statements to the workers and circumventing taxes and workers comp. With respect to my April 17, 2019 complaint, I not only described the practice that I believed was illegal (failing to provide wage statements), I also explained that such practice was illegal.

41. On or about May 13, 2019, I spoke to Sam Gold and Jose Arias about the Corporate Defendants' failure to pay painters on the books and the Corporate Defendants' failure to provide them wage statements. I indicated to Sam Gold and Jose Arias that they were going to get in trouble with the IRS and the state regulations, as well as workers comp.

42. In addition to the aforementioned complaints, during the period on or about November 28, 2018 through my termination, I made numerous complaints to Maritza Rodriguez at bi-

7

weekly meetings (with her and Joel Gold) about the Corporate Defendants' failure to give the painters wage statements.

43. On or about June 6, 2019, I communicated with my co-worker Eli Nichtberger about the Corporate Defendants' scheme of hiring day laborers to perform commercial painting work and paying them in cash without providing them wage statements. I indicated to Mr. Nichtberger that it's only a matter of time before it all comes crashing down.

## SALARY REDUCTION

44. On or about February 10, 2019, Moshe Gold decreased my salary in half from $150,000.00 to $75,000.00. Moshe Gold did not provide me any reason as to why he was decreasing my salary.

## WRITTEN WARNING

45. On or about May 28, 2019, I received a written warning from the Corporate Defendants. Attached as **Exhibit A** is a true and accurate copy of the written warning I was given.

46. The May 28, 2019 written warning is the first written warning I received while employed by the Corporate Defendants.

47. Each of the allegations in the May 28, 2019 written warning are baseless.

48. With respect to the allegation that I did not follow "office procedures regarding proposals," I'm not sure what this is referring to. I can speculate that this allegation may refer to Sam Gold suggesting that I prepare proposals on paper containing a particular JLM design with paint splatter on it. Even though my proposals had all the necessary information and the difference between the way I prepared my proposals and the way Sam Gold suggested I prepare proposals was simply aesthetic and not substantive, I expressed to Sam Gold many times that if he wanted me to prepare the proposal on the JLM paper like

he suggested that he should set up the template on my computer and my cell phone. For weeks and weeks, my requests to Sam Gold that he set up the template on my computer and my cell phone went nowhere. Sam Gold wasn't able to set up the template himself. When Sam Gold's computer guy, Yiddy finally set up the template weeks and weeks after I had requested it, Sam Gold then wasn't able to show me how it worked. Sam Gold indicated to me he needed to go back to Yiddy. As of the time I received the May 28, 2019 written warning and as of the time of my termination, Sam Gold and Yiddy still hadn't set up the template so as to be functional for me to use.

49. With respect to the allegation that I was "[n]ot managing assigned projects including but not limited to field operations, project schedule etc", this allegation is completely baseless. I have no idea what Defendants are referring to.

50. With respect to the allegation that I was "[n]ot knowledgeable of projects assigned to" this allegation is also completely baseless. I have no idea what Defendants are referring to.

51. In my May 28, 2019 written warning, Defendants also allege that I was "[n]ot providing office with proper paperwork to ensure jobs are handled properly including but not limited to Proposals, Change orders, approvals etc." This allegation is baseless. I have no idea what Defendants are referring to.

52. In my May 28, 2019 written warning, Defendants also allege that "[o]ffice work hours are Monday-Friday 7am to 4pm; your presence in the office is very limited however we don't have much going on in the field currently." This allegation is baseless. First of all, Defendants did not give me assigned office hours prior to issuing the May 28, 2019 written warning. Second of all, even though prior to issuing the May 28, 2019 written warning, Defendants did not require me to arrive at the office at a particular time or work in the

office any particular amount of time, I was in the office on a daily basis, I was typically the first person in the office and I was in the office by or before 7am (when I wasn't working outside the office) and worked in the office until after 4 pm (when I wasn't working outside the office).

53. The other employees came and went as they pleased and typically did not arrive at the office until hours after 7 am.

54. Generally, when I opened the office at or before 7am, no one else (other than my wife) would arrive at the office for hours. For example, Uday (the Corporate Defendants' estimator) typically wouldn't arrive at the office until 10 a.m. and then would take a very long lunch break. Additionally, Sam Gold, Maritza Rodriguez, and other office workers generally wouldn't arrive at the office until hours after 7 am.

55. Additionally, the allegation that my "presence in the office [was] very limited" is false. Even though Defendants did not require me to work in the office at set hours or for any particular duration of time, I spent at least some duration of time in the office each day during the workweek (other than on rare occasions when I took authorized paid off). I often did not work in the office for the entire workday because I had work to do outside the office.

56. Furthermore, the allegation that Defendants didn't "have much going on in the field" around the time they issued the May 28, 2019 written warning is false. At that time, there was plenty of work for me to do outside the office. When I wasn't in the office, I was doing work outside the office (such as attending a work-related meeting or going to a job site).

57. With respect to the allegation that I engaged in "[i]nsubordination to upper management" this allegation is also completely baseless. I have no idea what Defendants are referring to.

## MY TERMINATION

58. On June 14, 2019, Moshe Gold informed me in person in the office that he was terminating my employment. Mr. Gold informed me he was doing so because he couldn't trust me anymore. Mr. Gold did not give me any other reason why he was terminating my employment, nor did he explain why he felt he couldn't trust me anymore.

59. I did not quit before Moshe Gold terminated my employment.

60. Before Moshe Gold terminated my employment, I did not communicate to Moshe Gold that I quit.

61. Before Moshe Gold terminated my employment, I did not communicate to Sam Gold that I quit.

62. Before Moshe Gold terminated my employment, I did not communicate to anyone that I quit.

63. After I received the May 28, 2019 written warning, I approached Sam Gold about the allegations contained therein. To the best of my recollection, I believe I approached Sam Gold about the allegation in the written warning the same day I received it. When I asked Sam Gold to speak about the allegations in the May 28, 2019 written warning, Sam Gold refused to talk to me about such allegations and indicated that I needed to speak to his father, Moshe Gold about the written warning.

64. After I received the May 28, 2019 written warning, I asked Moshe Gold to speak about the allegations in such written warning on multiple occasions. To the best of my recollection, I believe I initially asked Moshe Gold to talk about the written warning the same day I

received it. Although I communicated my grievance to Moshe Gold about the office hours allegations and although I sought clarification about the other allegations, Moshe Gold did not provide any substantive response. Instead, Moshe Gold indicated to me that he would speak to me about the allegations in the written warning at a later point, but he never did. In between receiving the aforementioned written warning and my termination, Moshe Gold did not explain to me the allegations in the written warning despite my numerous requests for him to do so.

65. In between my receiving the May 28, 2019 written warning and my termination, I worked from the office each day from 7 am or earlier through after 4 pm (unless I left earlier to do work outside the office).

66. When asked at my deposition whether I changed my schedule after receiving the May 28, 2019 written warning, I answered no. This answer is accurate because even though I wasn't given any official hours prior to my written warning, I generally worked from 7 a.m. or earlier until later than 4 p.m. either in the office or out of the office. To be clear, prior to receiving the May 28, 2019 written warning, I typically started my workday at or before 7 am and finished my workday later than 4 pm. If I didn't have to do work outside of the office (such as a work-related meeting or going to a job in the field) during those hours, I was in the office during those hours.

67. When asked at my deposition whether I started appearing and staying in the office from seven a.m. to four p.m. after May 28, 2019, I answered no. I gave this answer because to the best of my recollection, I spent at least some time working outside the office between the hours 7 a.m. and 4 p.m. every workday after I received the May 28, 2019 until my termination.

68. When asked at my deposition whether I changed my conduct after I received the May 28, 2019 written warning, I answered no. I didn't change my behavior because the allegations in the letter were made up and they were so vague that there was no guidance as to what I needed to do differently. In between receiving the May 28, 2019 written warning and my termination, I sought clarification about the allegations in such warning from Moshe Gold and Sam Gold, but they did not explain such allegations to me. As I previously mentioned, when I asked Sam Gold to talk about the written warning, he indicated that I needed to speak to Moshe Gold about it. Then when I asked Moshe Gold for clarification about the written warning on multiple occasions, he indicated he would talk to me about it at a later point, but he never did. I did not change my behavior in the two (2) weeks or so between my receiving the written warning and my termination because no one gave me any specifics as to what I needed to do differently despite my requests to Moshe Gold and Sam Gold to provide clarification about the allegations in the written warning.

**OTHER ALLEGATIONS ABOUT MY PERFORMANCE**

69. When Moshe Gold reduced my salary, he did not tell me to continue doing my work, speed up my work, speed up my sales and then I will have money to be made back. Moshe Gold did not say anything like that to me at any time.

70. Moshe Gold did not speak to me about his company's alleged rules when he hired me, nor did he ever speak to me about his company's alleged rules.

71. I dispute Moshe Gold's allegation at his deposition that I didn't bring in sales enough to cover my pay. I believe, to my best of my knowledge, that I brought in at least three times my pay in sales on an annual basis in 2016, 2017, and 2018. I believe that as of the time I was terminated, I had either already brought in three times my pay in sales in 2019 or, at the

13

very least, I was on track to meet and exceed that number. Around the time I was terminated, I was in talks with a client about doing a job worth about 2.5 million dollars in sales.

72. Moshe Gold alleged at his deposition that I came, I left, and had no time. While it is true that I would come to the office and then leave during the day, I left the office to do work outside the office. With respect to Moshe Gold's allegation that I had no time, this allegation is baseless. I always made the time for Moshe Gold, even late at night. There were many occasions where Moshe Gold would contact me late at night about work. Whenever Moshe Gold had a question, I answered it.

73. At his deposition, Moshe Gold alleged that I was like a self employed person. I have no idea what he is talking about.

74. At his deposition, Moshe Gold alleged that he had no clue where I go, when I go, and what job I was handling. As Vice President of Operations, I was in a high-level position. Moshe Gold did not require me to report my whereabouts to him. I frequently spoke to Moshe Gold about jobs. Whenever Moshe Gold had a question, I would answer it. Moreover, the Corporate Defendants ran bi-weekly meetings. At these bi-weekly meetings, typically either I, Jose Arias, or another team member reported what was going on with my jobs.

75. At his deposition, Moshe Gold alleged that multi things got neglected. I have no idea what he is referring to.

76. At his deposition, Moshe Gold indicated that I didn't do my work. I have no idea what he is referring to. I did my work and I did it very well. From when I was hired through my termination, I made Moshe Gold significant profits.

77. At his deposition, Moshe Gold indicated that I didn't do the right proper work the way he wanted me to do. I have no idea what he is referring to.

78. At his deposition, Moshe Gold indicated that project manage was incorrect and I didn't project manage the way I was supposed to. I have no idea what he is referring to.

79. At his deposition, Moshe Gold indicated that I didn't follow the company system the way I was supposed to. I have no idea what he is referring to.

80. At his deposition, Moshe Gold indicated that I didn't report what was going on job. I have no idea what he is referring to. The Corporate Defendants ran bi-weekly meetings. At these bi-weekly meetings, typically either I, Jose Arias, or another team member reported what was going on with my jobs.

81. At his deposition, Moshe Gold indicated that I wasn't following up the rules that the person Sam was running. I have no idea what he is referring to.

82. At his deposition, Sam Gold accused me of failing to deliver quality work. I have no idea what Sam Gold is referring to.

83. At his deposition, Sam Gold accused me of not documenting my work. I have no idea what Sam Gold is referring to.

84. At his deposition, Sam Gold accused me of not sharing my work with the team. I have no idea what Sam Gold is referring to. We had bi-weekly meetings. At these bi-weekly meetings, typically either I, Jose Arias, or another team member reported what was going on with my jobs.

85. At his deposition, Sam Gold accused me of not documenting jobs right and missing a lot of information on almost every almost every job he was on. I have no idea what Sam Gold is referring to. Off the top of my head, I can not think of any instance where I did not document a job correctly or missed information. I certainly did not fail to document jobs

right on almost every job I was on. Likewise, I certainly did not miss a lot of information on almost every job I was on.

86. At his deposition, Sam Gold alleged that my jobs went over and beyond budget. I have no idea what Sam Gold is referring to. I can not think of any instance where one of my jobs went over and beyond budget.

87. At his deposition, Sam Gold alleged that I gave the direction to the guys to the field to go ahead when I never even sent out the letter and definitely get it approved so the company lost money every time that happened. I have no idea what Sam Gold is referring to. I can not think of any instance where I directed work to be done without obtaining the proper approval.

88. At his deposition, Sam Gold alleged that the company lost money because guys are working on the field and the company cannot collect money for the work and that the company is losing because the company is paying payroll and material. I have no idea what Sam Gold is referring to.

89. At his deposition, Sam Gold alleged that I gave the okay for the field to produce work without being sent the proposal or without being approved by the customer. I have no idea what Sam Gold is referring to. I can not think of any instance where I gave the okay for work to be done without sending out a proposal or without obtaining approval from a customer.

90. At his deposition, Sam Gold alleged that I failed to manage almost every project. I have no idea what Sam Gold is referring to.

91. Sam Gold alleged at his deposition that I didn't visit jobs. I have no idea what Sam Gold is referring to. I visited jobs on a very frequent basis (typically at least multiple times a week).

92. Sam Gold alleged at his deposition that I didn't do anything about the job so the job was running with no driver. I have no idea what Sam Gold is referring to.

93. Sam Gold alleged at his deposition that I didn't know specifics on the job and whenever I was asked, I didn't know. I have no idea what Sam Gold is referring to.

94. Sam Gold alleged at his deposition that I didn't know production on the job, how is job going, details. I have no idea what Sam Gold is referring to.

95. Sam Gold alleged at his deposition that I said at a weekly meeting that I didn't visit the job the last two weeks. I have no idea what Sam Gold is referring to.

96. Sam Gold alleged at his deposition that I failed to provide him the proposal, production on the field, and the communication with the clients. I have no idea what Sam Gold is referring to.

97. Sam Gold alleged that every office worker was required to be in the office Monday through Friday, seven a.m. to four p.m. This statement is completely false. Generally, the other office workers did not arrive at the office until hours after 7 am and other office workers came and went as they pleased.

98. Sam Gold alleged at his deposition that I came in less than before after I received the May 28, 2019 written warning. This allegation is baseless. There were about two weeks in between my receiving the May 28, 2019 written warning and my termination. During those two weeks, I came to the office every workday.

99. Sam Gold alleged at his deposition that I engaged in insubordination to upper management by failing to report my progress on the job at biweekly meeting. I have no idea what Sam Gold is referring to. Typically, either I, Jose Arias, or another team member reported progress on my jobs at bi-weekly meetings.

Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 26th, 2021

_____
Angelo Lopes